IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JASON EDWARD ROSS,               )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )    Civil Action No. 10-1047
                                 )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                 )
          Defendant.             )

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Jason Edward Ross, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying his applications for disability
insurance benefits ("DIB") and supplemental security income
("SSI") under Titles II and XVI, respectively, of the Social
Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently
before the Court are the parties' cross-motions for summary
judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth
below, Plaintiff's motion for summary judgment will be granted
insofar as he seeks a remand for further proceedings, and the
Commissioner's cross-motion for summary judgment will be denied.

---

[1] The Social Security system provides two types of benefits based on an
inability to engage in substantial gainful activity: the first type, DIB,
provides benefits to disabled individuals who have paid into the Social
Security system through past employment, and the second type, SSI, provides
benefits to disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the Social Security
system.

## II. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on March 30, 2006, alleging disability since July 23, 2005 due to anxiety, depression, hepatitis C and narcotic addiction. (R. 102-06, 107-10, 122). Following the denial of Plaintiff's applications, he requested a hearing before an administrative law judge ("ALJ"). (R. 69-73, 74-78, 79). Plaintiff testified at the hearing which was held on September 18, 2007. A vocational expert ("VE") also testified. (R. 26-65).

The ALJ issued a decision on November 15, 2007, denying Plaintiff's applications for DIB and SSI based on his determination that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2] (R. 10-25). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on June 16, 2010. (R. 1-5, 7-9). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

---

[2] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a).

III. BACKGROUND[3]

Plaintiff was born on July 12, 1976. He was 31 years old
at the time of the hearing. (R. 32). Plaintiff graduated from
high school in 1993. Plaintiff then attended Berklee College of
Music in Boston, Massachusetts for 4 years, earning a bachelor's
degree in music synthesis. (R. 33-34).

With regard to work history, in 2000, Plaintiff worked for
a period of time as an audio visual technician for an off-track
betting facility. (R. 36-37). From January 2001 to July 2001,
Plaintiff was employed by a used car website.[4] (R. 35, 123).
From January 2002 to November 2002, Plaintiff was employed as a
clerk in a grocery store. (R. 37-38, 123). Finally, from 2003
to July 23, 2005, Plaintiff was employed by the Laurel Caverns
Conservancy as a tour guide. Plaintiff claims that he could no
longer perform his job as a tour guide because he had a hard
time showing up for work due to fatigue. (R. 38-39, 122-23).

In August 2001, Plaintiff committed himself to the
psychiatric ward of Highlands Hospital in Connellsville,
Pennsylvania for anxiety and depression.[5] After five days of

---

[3] In summarizing the background of this case, the Court has utilized a
disability report completed by Plaintiff on March 30, 2006 (R. 121-30), a
report of Plaintiff's recent medical treatment dated August 31, 2007 (R. 157-
59), and Plaintiff's testimony at the hearing on September 18, 2007 (R. 32-
60).

[4] In this position, which was not full-time, Plaintiff visited car lots to take
pictures of, and obtain information about, used cars. He then uploaded the
pictures and information to the employer's website from his home. (R. 35).
[5] Plaintiff has longstanding diagnoses of anxiety and depression. Plaintiff
testified that he suffered his first panic attack in 1993 following an

3

treatment with medication and counseling, Plaintiff was discharged from the hospital. (R. 45-46, 127).

Plaintiff has been receiving mental health treatment at Chestnut Ridge Counseling Services, Inc. ("Chestnut Ridge") since September 2001. Dr. William Cutlip, Plaintiff's treating psychiatrist at Chestnut Ridge,[6] prescribes Zoloft and Klonopin to treat Plaintiff's anxiety and depression.[7] At the time of the hearing, Plaintiff was attending therapy sessions at Chestnut Ridge on a weekly or bi-weekly basis and he was being seen by Dr. Cutlip for medication checks every 3 months. (R. 48-49, 56, 125-26, 158).

Shortly after his discharge from Highlands Hospital in 2001, Plaintiff started using heroin. In 2002, Plaintiff was treated for drug addiction several times, and, in 2003, Plaintiff sought treatment at a methadone maintenance clinic.[8] By 2006, Plaintiff

---

since that time. (R. 43-44).

[6] At the time of the hearing before the ALJ, Dr. Cutlip was leaving Chestnut Ridge. As a result, Plaintiff was being transferred to his wife, Dr. Marija Cutlip, who is also a psychiatrist, for medication checks. (R. 48-49).
[7] Zoloft is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder and social anxiety disorder. Side effects of Zoloft include nausea, diarrhea, constipation, loss of appetite, weight changes, drowsiness, excessive tiredness and nervousness. Klonopin is used, among other things, to relieve panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks). Side effects of Klonopin include drowsiness, difficulty thinking or remembering and muscle or joint pain. www.nlm.nih.gov/medlineplus (last visited 4/1/2011) ("Medlineplus").
[8] Methadone is used, among other things, to prevent withdrawal symptoms in patients who are addicted to opiate drugs and are enrolled in treatment programs in order to stop taking or continue not taking the drugs. Methadone works as a substitute for abused opiate drugs by producing similar effects and preventing withdrawal symptoms in people who have stopped using these drugs. Side effects of methadone include drowsiness, weakness, headache, nausea, constipation, loss of appetite, stomach pain, mood changes, and difficulty falling asleep or staying asleep. Medlineplus.

4

By 2006, Plaintiff was "clean from all opiates." At the time of the hearing, Plaintiff continued to be on methadone maintenance. (R. 45-47, 158).

In 2003, Plaintiff was diagnosed with the hepatitis C virus.[9] From July 2006 to June 2007, Plaintiff's hepatitis C infection was treated with peginterferon and ribavirin ("the interferon treatment").[10] Plaintiff claims that during the interferon treatment, he was unable to work due to flu-like symptoms (headaches, fevers, chills), fatigue, stomach problems (constipation, diarrhea, cramps) and anxiety.[11] (R. 42-43).

---

drugs. Side effects of methadone include drowsiness, weakness, headache, nausea, constipation, loss of appetite, stomach pain, mood changes, and difficulty falling asleep or staying asleep. Medlineplus.

[9] Hepatitis C is a virus that infects the liver and may cause severe liver damage or liver cancer. Medlineplus.

[10] Peginterferon is used alone or in combination with ribavirin to treat chronic (long-term) hepatitis C infection in people who show signs of liver damage. Side effects of peginterferon include nausea, loss of appetite, diarrhea, constipation, weight loss, headache, dizziness, confusion, difficulty concentrating, feeling cold or hot all the time, sweating, flushing, runny nose and difficulty falling asleep or staying asleep. Ribavirin is an antiviral medication which works by stopping the virus that causes hepatitis C from spreading inside the body. The side effects of Ribavirin include upset stomach, diarrhea, constipation, loss of appetite, weight loss, difficulty concentrating, difficulty falling asleep or staying asleep and muscle or bone pain. Medlineplus.

[11] In this regard, Plaintiff testified that he lost more than 40 pounds during the interferon treatment due to a lack of appetite and an upset stomach. Plaintiff also testified that he slept a "ridiculous amount" of time, *i.e.*, 12 to 16 hours a night with 4-hour naps during the day, and that he woke up with anxiety, cramps, headache and grogginess. At the time of the hearing, it had been approximately 2 months since Plaintiff stopped the interferon treatment. Although he continued to suffer from anxiety, Plaintiff testified that he was not as fatigued. (R. 32, 50-51).

IV. MEDICAL EVIDENCE[12]

Upon returning to Uniontown, Pennsylvania from Boston
Massachusetts in September 2001, Plaintiff sought mental health
treatment at Chestnut Ridge. On September 28, 2001, Dr. Ronald
Lobo, a psychiatrist, performed an evaluation of Plaintiff who
reported that he had been treated for anxiety, panic attacks and
depression for a "very long time." Dr. Lobo noted that
Plaintiff recently had been admitted to the inpatient
psychiatric unit of Highlands Hospital for increasing depression
with suicidal ideation, rage and anger problems, sadness and
homicidal ideation toward his ex-girlfriend and her family.
Based on Plaintiff's report of his history and a mental status
examination, Dr. Lobo diagnosed Plaintiff with "Marijuana Abuse;
R/O Cannabis Induced Mood Disorder, Cannabis Induced Anxiety
Disorder; R/O Major Depressive Disorder, Recurrent; Generalized
Anxiety Disorder; and Panic Disorder without Agoraphobia." Dr.
Lobo rated Plaintiff's score on the Global Assessment of
Functioning ("GAF") Scale a 50.[13] Dr. Lobo adjusted Plaintiff's

---

[12] In summarizing the medical evidence in this case, the Court has included
medical records pre-dating Plaintiff's alleged onset date of disability (July
23, 2005) for background purposes.

[13] The GAF scale is used by clinicians to report an individual's overall level
of functioning. The scale does not evaluate impairments caused by physical
or environmental factors. The GAF scale considers psychological, social and
occupational functioning on a hypothetical continuum of mental health to
mental illness. The highest possible score is 100, and the lowest is 1. A
GAF score between 41 and 50 denotes the following: "**Serious symptoms** (e.g.,
suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any
serious impairment in social, occupational, or school functioning** (e.g., no
friends, unable to keep a job). American Psychiatric Association: Diagnostic

6

medications and instructed him to continue the individual therapy sessions he had been participating in at Chestnut Ridge. (R. 193-96).

On September 18, 2003, Plaintiff was admitted to the methadone maintenance program at Addiction Specialists, Inc. ("ASI") for opiate addiction. (R. 167-70).

Plaintiff received regular mental health treatment at Chestnut Ridge through May 4, 2005. (R. 229-89). Due to his dissatisfaction with the treatment, Plaintiff was evaluated for mental health treatment at Family Behavioral Resources ("FBR") on May 25, 2005. Based on Plaintiff's reported history and mental status examination, Plaintiff was diagnosed with panic disorder without agoraphobia, opiate and cannabis dependence and obsessive compulsive personality features. A GAF score of 60 was assigned to Plaintiff.[14] (R. 171-79).

Plaintiff was referred to Dr. Ben Brickley, a psychiatrist at FBR, for medication management. Following an evaluation on June 6, 2005, Dr. Brickley agreed with Plaintiff's intake diagnoses, adjusted Plaintiff's medications and assigned a GAF score of 50 to Plaintiff. (R. 184-85).

---

and Statistical Manual of Mental Disorders, 4th Edition, Text Revision (2000) ("DSM-IV"), at 32-24 (boldface in original).
[14] GAF scores between 51 and 60 denote the following: **"Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends or conflict with peers or co-workers). DSM-IV, at 32-34.

On November 23, 2005, Dr. Samuel Tallerico, who treats Plaintiff at ASI's methadone maintenance clinic, completed an employability assessment form for Plaintiff at the request of the Pennsylvania Department of Public Welfare. Dr. Tallerico rendered the opinion that Plaintiff was temporarily disabled (from November 7, 2005 to November 7, 2006) due to depression and narcotic addiction. (R. 186-87).

Plaintiff's last therapy session at FBR took place on January 3, 2006. (R. 180). Approximately two months later, Plaintiff returned to Chestnut Ridge for mental health treatment and responsibility for his medication management was assigned to Dr. Cutlip, who is a neuropsychiatrist. During a medication check on February 23, 2006, Plaintiff reported fluctuating general anxiety but no panic attacks. Dr. Cutlip's diagnoses included generalized anxiety disorder and opioid dependence; he assigned a GAF score of 45 to Plaintiff; and he adjusted Plaintiff's medications. (R. 227-28).

Plaintiff's next medication check with Dr. Cutlip took place on March 9, 2006. Plaintiff reported continued significant episodes of anxiety, lasting hours at a time. Dr. Cutlip adjusted Plaintiff's medications and recommended that Plaintiff enter the partial hospitalization program at Chestnut Ridge the next week. (R. 225-26). Plaintiff was admitted to the program on March 13, 2006, beginning three days a week. At

the time of admission, Dr. Cutlip rated Plaintiff's GAF score a
40.[15]   (R. 190-92).

Plaintiff was referred by his primary care physician, Dr.
Miller Oppy, to Southwest Gastrointestinal Specialists, P.C.
("SGS") for evaluation of his chronic hepatitis C infection.[16]
Based on the evaluation, which was performed by Dr. Frederick
Ruthardt on April 4, 2006, Plaintiff was deemed an excellent
candidate for interferon treatment.  However, in light of
Plaintiff's history of anxiety and depression, it was noted that
these conditions would have to be closely monitored during the
interferon treatment.  (R. 302-04).

During a medication check with Dr. Cutlip on April 6, 2006,
Plaintiff reported no severe attacks of anxiety.  Dr. Cutlip
noted that Plaintiff's attention and concentration were "fairly
good;" that his affect was "mildly constricted;" his mood was
"mildly dysthymic;" and his anxiety symptoms were "currently
stable."  Dr. Cutlip rated Plaintiff's GAF score a 45.  (R. 222-
23).

---

[15] A GAF score between 31 and 40 denotes the following: "**Some impairment in
reality testing or communication** (e.g., speech is at times illogical,
obscure, or irrelevant) **OR major impairment in several areas, such as work or
school, family relations, judgment, thinking, or mood** (e.g, depressed man
avoids friends, neglects family, and is unable to work; child frequently
beats up younger children, is defiant at home, and is failing at school."
DSM-IV, at 32-34.
[16] The medical evidence in this case contains records showing that Plaintiff
has been treated by Dr. Oppy for a variety of ailments, including a lower
extremity burn from his motorcycle (August 11, 2005), sinusitis (March 3,
2006), hepatitis C (June 1, 2006), otitis media (December 19, 2006) and
ringworm (February 16, 2007).  (R. 188-89, 417-19).

On April 20, 2006, Charles H. Goyette, Ph.D., a
rehabilitation specialist, evaluated Plaintiff at the request of
the Fayette County Assistance Office "to assess current levels
of intellectual, psychological, academic achievement,
neurocognitive and dexterity functioning." After administering
eight tests to Plaintiff, including the Wechsler Adult
Intelligence Scale, a personality test, the Beck Depression
Inventory and a neuropsychological battery, Dr. Goyette rendered
the opinion that barriers to Plaintiff obtaining competitive
employment included (1) his unstable emotional status (depressed
mood, social withdrawal, pessimism and sadness), (2) sleep
disturbance (problems initiating and maintaining sleep), (3)
increased levels of anxiety, insecurity, instability and panic
attacks, (4) overwhelming feelings of inadequacy and low
personal worth, (5) poor stress coping skills, (6) limited
ability to interact with others, and (7) poor decision making
skills (use of opioids for self-medication). Considering the
foregoing barriers, Dr. Goyette opined that Plaintiff would not
be able to obtain and maintain any level of employment for at
least 12 to 24 months, and that initial employment should be
limited to part-time work. (R. 316-22).

On June 29, 2006, Raymond Dalton, Ph.D., a State agency
psychological consultant, completed a Mental RFC Assessment for
Plaintiff based on a review of his case file. With regard to

10

various abilities relating to Understanding and Memory, Sustained Concentration and Persistence, Social Interaction and Adaptation, Dr. Dalton opined that Plaintiff was either not significantly limited or only moderately limited. As a result, Dr. Dalton concluded that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his mental impairments. (R. 323-25).

Dr. Dalton also completed a Psychiatric Review Technique form in connection with Plaintiff's applications for DIB and SSI on June 29, 2006. Dr. Dalton opined that although Plaintiff suffers from major depressive disorder, panic disorder and opioid dependence, he was only mildly limited in his activities of daily living ("ADLs"), moderately limited in maintaining social functioning and maintaining concentration, persistence or pace and had experienced only one or two episodes of decompensation of an extended duration. (R. 326-39).

Following adjustments in the medications prescribed by Dr. Cutlip for Plaintiff's anxiety and depression, Plaintiff was cleared to begin the interferon treatment through SGS on July 3, 2006. (R. 305). A week later, Plaintiff attended a teaching session and gave himself his first injection of peginterferon and ribavirin. (R. 412).

On July 25, 2006, based on a review of Plaintiff's case file, Jason Rasefske, M.D., a State agency medical consultant, completed a Physical RFC Assessment relating to Plaintiff's diagnosis of chronic active hepatitis C and reports of fatigue and abdominal pain. With regard to exertional limitations, Dr. Rasefske opined that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday, and push and/or pull with his upper and lower extremities without limitation. Dr. Rasefske further opined that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. 340-45).

During a follow-up visit at SGS on July 31, 2006, Plaintiff reported increased anxiety since the commencement of the interferon treatment. As a result, it was recommended that Plaintiff seek treatment from another doctor for the anxiety. (R. 49, 409-10). On August 14, 2006, Plaintiff was seen by Dr. Mumduh El-Attrache, who prescribed Xanax for his panic attacks.[17] Dr. El-Attrache also recommended that Plaintiff take various vitamins to combat deficiencies caused by the interferon

---

[17] Xanax is used to treat anxiety disorders and panic disorder. It works by decreasing abnormal excitement in the brain. Side effects of Xanax include drowsiness, headache, tiredness, irritability, difficulty concentrating, nausea, constipation, changes in appetite and weight changes. Medlineplus.

treatment[18]. (R. 49, 158, 360-63). A note from Plaintiff's follow-up visit at SGS on August 23, 2006, indicates that the interferon treatment "definitely exacerbated" Plaintiff's anxiety and depression. (R. 408).

During his follow-up visit at SGS on September 20, 2006, Plaintiff's anxiety and depression were described as "stable." However, Plaintiff reported nausea from the interferon treatment. (R. 407). As to the stomach problems caused by the interferon treatment, Dr. Ruthardt prescribed Reglan, Miralax, Analpram HC and Anusol for Plaintiff.[19] (R. 158).

During a medication check with Dr. Cutlip on November 20, 2006, Plaintiff reported that his anxiety had generally improved. However, he continued to feel fatigued a couple of days after his interferon injections. Plaintiff also reported a few episodes of panic-like symptoms. Dr. Cutlip described Plaintiff's attention and concentration as "fairly good;" his affect as "mildly to moderately constricted;" and his mood as "mildly depressed." Dr. Cutlip rated Plaintiff's GAF score on this date a 45. (R. 389).

---

[18] Despite the completion of Plaintiff's interferon treatment, he continued to be treated by Dr. El—Attrache at the time of the hearing. (R. 49).
[19] Reglan is used, among other things, to relieve heartburn. Its side effects include drowsiness, excessive tiredness, headache, diarrhea and nausea. Miralax is used to treat occasional constipation. Analpram HC and Anusol are used to treat, among other things, the swelling and discomfort of hemorrhoids. Medlineplus.

Plaintiff's next follow-up visit at SGS took place on December 12, 2006. Plaintiff's anxiety and depression remained stable; however, he reported constipation and nausea and he was diagnosed with cheilosis (likely related to a vitamin deficiency).[20] (R. 406).

Plaintiff saw Dr. Cutlip for a medication check on January 23, 2007. Plaintiff reported continued episodes of anxiety, but no discrete panic attacks. Plaintiff also reported periods of low mood and intermittent fatigue which was quite severe at times. Dr. Cutlip described Plaintiff's attention and concentration as "fair;" his affect as "moderately constricted;" and his mood as "mildly depressed." Dr. Cutlip rated Plaintiff's GAF score on that date a 45. (R. 393).

By January 24, 2007, Plaintiff had been on the interferon treatment for 27 weeks and was exhibiting symptoms of anemia. Plaintiff's depression and anxiety were stable, and his cheilosis and constipation had resolved with treatment. However, he was suffering from external hemorrhoids and having difficulties with visual acuity. (R. 405).

On January 31, 2007, Dr. Cutlip completed a Mental RFC Assessment for Plaintiff. With regard to making occupational adjustments, Dr. Cutlip considered Plaintiff's fatigue,

---

[20] Cheilosis is an abnormal condition of the lips characterized by scaling of the surface and by the formation of fissures in the corners of the mouth. Medlineplus.

difficulty concentrating, tendency to isolate and chronic
fluctuating anxiety and rendered the following opinions:
Plaintiff's ability to follow work rules, use judgment and
function independently was "Good;" his ability to relate to co-
workers and interact with supervisors was "Fair;" and his
ability to deal with the public, deal with work stresses and
maintain attention and concentration was "Seriously limited."
Turning to performance adjustments, Dr. Cutlip rated Plaintiff's
ability to understand, remember and carry out complex, as well
as detailed, job instructions as "Fair," and his ability to
understand, remember and carry out simple job instructions as
"Good."  As to making personal-social adjustments, Dr. Cutlip
rated Plaintiff's ability to maintain personal appearance as
"Fair," and his ability to behave in an emotionally stable
manner, relate predictably in social situations and demonstrate
reliability as "Seriously limited."  (R. 347-54).

     Dr. Cutlip also completed a Mental Impairment Questionnaire
for Plaintiff on January 31, 2007.  Dr. Cutlip identified
Plaintiff's symptoms as mood disturbance, substance dependence,
anhedonia or pervasive loss of interests and generalized
persistent anxiety.  Dr. Cutlip opined that Plaintiff's ADLs
were only slightly limited; that he had moderate difficulties in
maintaining social functioning; that he often experienced
deficiencies of concentration, persistence or pace resulting in

failure to complete tasks in a timely manner; and that he had repeated episodes of decompensation in work or work-like settings which caused him to withdraw from that situation or to experience exacerbation of signs and symptoms. Finally, Dr. Cutlip rated Plaintiff's GAF score, as well as his highest GAF score during the previous year, a 45. (R. 355-57).

As noted previously, six months after Plaintiff initiated the interferon treatment, he began to exhibit signs of anemia. As a result, he was referred to Dr. Sajid Peracha of the UPMC Cancer Center in Uniontown, Pennsylvania for an evaluation. During the evaluation, which was performed on February 12, 2007, Plaintiff complained of "tiredness, fatigability, no pep whatsoever, having side effects from the treatment for hepatitis C as well." Dr. Peracha diagnosed Plaintiff with hepatitis C-related anemia, and he prescribed Aranesp and Neupogen for Plaintiff.[21] (R. 158-59, 441-42).

With respect to a follow-up visit at SGS on April 19, 2007, Dr. Ruthardt noted that Plaintiff was tolerating the interferon treatment "fairly well." Plaintiff's depression and anxiety

---

[21]Aranesp is used to treat anemia, a lower than normal number of red blood cells. Side effects of Aranesp include headache, nausea, stomach pain, diarrhea, constipation and body, joint or muscle aches. Neutrophils are a type of white blood cell responsible for much of the body's protection against infection. Neupogen is used, among other things, to decrease the chance of infection in people with severe chronic neutropenia, a condition in which there are a low number of neutrophils in the blood. Medlineplus.

were stable; his irregular bowel habit was stable on medication; and his cheilosis was stable on a multi-vitamin.  (R. 463).

In the record of an office visit on May 14, 2007, Dr. Peracha noted that Plaintiff's interferon treatment would end in June, and that, because Plaintiff's anemia was related to the treatment, he did not expect the anemia to be an ongoing problem.  (R. 439-40).

V. ALJ'S DECISION

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The process was described by

17

the Supreme Court in <u>Sullivan v. Zebley</u>, 493 U.S. 521 (1990), as follows:

\* \* \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. <u>See</u> 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. <u>See</u> 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

\* \* \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process for making disability determinations. At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience) and determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy in

18

light of his or her RFC.  Ramirez v. Barnhart, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability, and the medical evidence established that Plaintiff suffers from the following severe impairments: chronic hepatitis C infection, major depressive disorder, a history of anxiety and panic attacks, and a history of narcotics addiction with agonist therapy (methadone).[22]  (R. 15-19).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 5.05 relating to chronic liver disease, and Listings 12.04, 12.06 and 12.09, relating to affective disorders, anxiety related disorders and substance addiction disorders, respectively.  (R. 19-21).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform the exertional demands of light work with the following

---

[22] Agonist therapy, also called replacement therapy, treats dependence on a substance by replacing it with one that has similar effects. www.edrugrehab.com (last visited 4/1/11).

19

limitations: (1) no more than simple tasks limited to 1 to 3 steps; (2) no more than occasional contact with supervisors, co-workers or the general public; and (3) no more than low stress work that does not require fast-paced tasks or completion of piece rate or quota activity. (R. 21-23). The ALJ then proceeded to step four, finding that in light of Plaintiff's RFC, he is unable to perform any of his past relevant work. (R. 23).

Finally, at step five, considering Plaintiff's age, education, work experience and RFC and the VE's testimony, the ALJ found that Plaintiff could perform other work existing in the national economy, including the jobs of a laundry folder, a machine tender, a general sorter and a general office clerk. (R. 23-24).

VI. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord

deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. <u>Monsour Medical Center v. Heckler</u>, 806 F.2d 1185, 1190-91 (3d Cir.1986).

VII. ANALYSIS

In assessing Plaintiff's RFC, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms, but that Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not entirely credible. (R. 22). The ALJ supported the adverse credibility determination on three grounds.

First, the ALJ noted that (a) Plaintiff suffered a burn on August 11, 2005 while riding a motorcycle; (b) Plaintiff's anxiety and depression did not preclude him from getting his girlfriend's child ready for school in the morning; and (c) Plaintiff drove himself to the hearing. These activities, according to the ALJ, significantly undercut Plaintiff's alleged limitations and overall disability. (R. 22).

Second, the ALJ stated that Plaintiff's physicians "generally noted" throughout the record that Plaintiff's anxiety was "stable" while taking his medication. Therefore, according to the ALJ, the objective evidence did not support Plaintiff's allegations of disabling symptoms. (R. 22).

Third, the ALJ gave more weight to the opinions of the non-examining State agency medical and psychological consultants regarding Plaintiff's physical and mental RFCs than (1) the opinion rendered by Dr. Tallerico that Plaintiff was temporarily disabled from November 7, 2005 to November 7, 2006 due to depression and narcotic addiction, and (2) the opinion rendered by Dr. Goyette on April 20, 2006 that Plaintiff could not obtain and maintain employment for 12 to 24 months due to various barriers resulting from Plaintiff's anxiety and depression. The ALJ gave the following reason for giving less weight to the opinions of Dr. Tallerico and Dr. Goyette: "These opinions are dispositive of the issue *sub judice*, and are therefore reserved exclusively to the Commissioner." (R. 23).

Plaintiff's Activities

With regard to the activities on which the ALJ relied to support his determination that Plaintiff's allegations of disabling symptoms were only partially credible, Plaintiff contends that these limited activities, *i.e.*, riding a motorcycle in 2005, driving a car and helping his girlfriend's daughter get ready for school in the morning, do not constitute substantial evidence supporting the ALJ's denial of benefits. (Docket No. 9, p. 17). The Court agrees.

As noted by Plaintiff, district courts repeatedly have held that having a disability does not mean that "a claimant must

vegetate in a dark room excluded from all forms of human and social activity." Smith v. Califano, 637 F.2d 968, 971-72 (3d Cir.1981). See also Fargnoli v. Massanari, 247 F.3d 34, 40 n.5 (3d Cir.2001)(Social Security disability claimant's trip to Europe after onset of his allegedly disabling back condition could not be the basis for a finding that he was capable of doing a light exertional job, as sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity); Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir.2001)("The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily demonstrate that she is not disabled."); Tang Apfel, 205 F.3d 1084, 1086 (8th Cir.2000)(Disability claimant's ability to prepare children for school and to do laundry did not indicate ability to perform full-time work); Yawitz v. Weinberger, 498 F.2d 956, 960 (8th Cir.1974)(The fact that disability claimant drives, goes camping and works around the house on occasion is not substantial evidence that he can engage in substantial gainful activity).

Weight Attributed to Dr. Goyette's Opinion

Plaintiff also asserts that the ALJ's reason for rejecting the opinion rendered by Dr. Goyette on April 20, 2006 regarding his inability to engage in substantial gainful employment for 12 to 24 months was erroneous. Again, the Court agrees.

Under the Social Security Regulations, an opinion by a medical source that a claimant is disabled is not entitled to any special significance because the determination of disability is reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e), 416.927(e). However, Dr. Goyette did not simply render a conclusory opinion that Plaintiff was disabled. Rather, Dr. Goyette explained in great detail the basis for his opinion which was based on a comprehensive evaluation of Plaintiff involving the administration of numerous tests.[23] Accordingly, on remand, the ALJ will be directed to consider further Dr. Goyette's opinion regarding Plaintiff's mental impairments and

---

[23] For example, Dr. Goyette described the results of the objectively scored personality test administered to Plaintiff as follows:

\*   \*   \*

In reviewing Mr. Ross' clinical profile, it combines the worst clinical features of all of the important personality factors: withdrawal, anxiety, moodiness, and dependency, each to an extreme degree. Neuroticism is markedly elevated. Submission and resignation are also important features of Mr. Ross' personality profile, along with a sense of inadequacy and low personal worth. Depressive tendencies are also prominent.

Other features of the profile include an extremely high degree of apprehensiveness. Accordingly, Mr. Ross is likely to be chronically worried, guilty, moody, and experience frequent periods of depression. High degrees of apprehensiveness are very common in clinical disorders of all types. There is also consistent evidence of an inability to maintain proper levels of emotional and/or behavior control. Undisciplined self-conflict also appears in Mr. Ross' profile suggesting that he is likely to be careless of social norms and rules. With all of the clinical signs present in this profile, it is fair to conclude that Mr. Ross' overall emotional adjustment is poor.

\*   \*   \*

(R. 318).

set forth his reasons for rejecting the findings from Plaintiff's testing that support his claim of disability.

## Failure to Consider Dr. Cutlip's Opinion

A ruling that a claimant who seeks Social Security disability benefits is not disabled is required to be vacated when the ALJ fails to explain his or her implicit rejection of probative evidence which supports the claim or even to acknowledge the presence of such evidence.  See Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981).

In determining the weight to be given the medical opinions in the record, the ALJ failed to state reasons for his implicit rejection of Dr. Cutlip's opinion regarding the limitations resulting from Plaintiff's mental impairments.  Plaintiff contends the ALJ erred in doing so, and, again, the Court agrees.

As noted in the summary of the medical evidence, in the Mental RFC Assessment completed on January 31, 2007, Dr. Cutlip rendered the opinion that Plaintiff was seriously limited with regard to (a) dealing with the public, (b) dealing with work stresses, (c) maintaining attention/concentration, (d) behaving in an emotionally stable manner, (e) relating predictably in social situations and (f) demonstrating reliability.  In support of this opinion, Dr. Cutlip specifically noted Plaintiff's fatigue, difficulty concentrating, tendency to isolate and

chronic fluctuating anxiety.  (R. 349, 351).  Despite the
obvious probative value of this evidence, the ALJ failed to
include Dr. Cutlip's opinion in his discussion of the weight
accorded to medical opinions in the record.[24]  (R. 23).

The ALJ's failure to discuss the weight to which Dr.
Cutlip's opinion concerning Plaintiff's work-related limitations
was entitled is especially troubling because Dr. Cutlip is a
long-time treating source.  "A cardinal principle guiding
disability eligibility determinations is that the ALJ accord
treating physicians' reports great weight, especially 'when
their opinions reflect expert judgment based on a continuing
observation of the patient's condition over a prolonged period
of time.'"  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000),
quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  In
addition, Dr. Cutlip is a specialist in neuropsychiatry and the
Social Security Regulations provide that more weight is to be
given to the opinion of a specialist about issues related to his
or her medical specialty.  See 20 C.F.R. §§ 404.1527(d)(5),
416.927(d)(5).

On remand, the ALJ will be directed to include Dr. Cutlip's
opinion in which discussion of the weight to which the medical
opinions in the record are entitled.

---

[24] The ALJ did mention the Mental RFC Assessment completed by Dr. Cutlip on
January 31, 2007 in the summary of the medical evidence.  (R. 19).  However,
he ignored the assessment in determining the weight to which the medical
opinions in the record were entitled.

## Side Effects of Plaintiff's Interferon Treatments

Plaintiff also asserts that the ALJ erred by failing to even acknowledge the evidence relating to the effect of the interferon treatments on his ability to work. Again, the Court agrees.

As noted in the summary of the medical evidence, Plaintiff experienced significant, persistent side effects during the interferon treatments, including increased anxiety, extreme fatigue, stomach problems and anemia. In fact, Plaintiff was referred by his medical provider at SGS to Dr. El-Attrache for treatment of the increased anxiety caused by the interferon treatments and to Dr. Peracha for treatment of the anemia caused by the interferon treatments.[25] Yet, the ALJ fails to even mention the impact of the interferon treatments on Plaintiff's ability to engage in substantial gainful activity on a regular and continuing basis, i.e., 8 hours a day, 5 days a week. See Social Security Ruling 96-8p. On remand, the ALJ will be directed to do so.

---

[25] When Plaintiff was seen by Dr. Peracha on February 12, 2007 for treatment of anemia caused by the interferon treatment, the doctor noted that Plaintiff was taking 13 medications at that time. (R. 461). In this connection, the Court notes that Plaintiff's allegations of disabling symptoms also are supported by the side effects of a number of these medications, including Zoloft (drowsiness, excessive tiredness, nervousness), Klonopin (drowsiness, difficulty thinking or remembering), methadone (drowsiness, difficulty falling asleep and staying asleep, mood changes), peginterferon (difficulty concentrating, difficulty falling asleep or staying asleep), ribavirin (difficulty concentrating, difficulty falling asleep or staying asleep), and Xanax (drowsiness, tiredness, difficulty concentrating).

Stable on Medication

One final point needs to be addressed. In support of his adverse credibility determination in this case, the ALJ states that Plaintiff's physicians have noted generally that he was stable while taking his medication. Therefore, according to the ALJ, the objective medical evidence also does not support the severity and frequency of the limitations alleged by Plaintiff. (R. 22). With regard to the references to Plaintiff's anxiety and depression being stable, the ALJ cites Exhibit 5F.

While there are several notations in Exhibit 5F to Plaintiff's anxiety and depression being stable on medication during the relevant time period (R. 219, 223),[26] there are many more notations in the record regarding Plaintiff's continued difficulties with anxiety which the ALJ fails to mention. (R. 190, 225, 227, 384, 393, 399).

In any event, it was error for the ALJ to rely on several notations that Plaintiff's anxiety was stable with medication in light of the abundant other evidence showing Plaintiff's ongoing problems with anxiety. The relevant inquiry with regard to a disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity. See Morales v. Apfel, 225 F.3d 310, 319 (3d Cir.2000)("For a person,

---

[26] Significantly, although Dr. Cutlip noted on several occasions that Plaintiff's anxiety was stable on medication, the doctor also rated Plaintiff's GAF score a 45 on those dates, indicating serious symptoms or impairments. (R. 219, 222-23).

such as Morales, who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic. Dr. Erro's observation that Morales is 'stable and well controlled with medication' during treatment does not support the medical conclusion that Morales can return to work.").

William L. Standish
United States District Judge

Date: _April 5, 2011_